**UNITED STATES of America,**
**Appellee,**

v.

**Gary HARRINGTON, Craig Whitman, Mark Vince, and Michael Crawford, Defendants,**

**Christopher MAIN, Defendant–**
**Appellant.**

**Docket No. 01–1505.**

United States Court of Appeals, Second Circuit.

Argued: Aug. 27, 2003.

Decided: Jan. 6, 2004.

 

Darrell B. Fields, Legal Aid Society, Federal Defender Division, New York, N.Y., for Defendant–Appellant.

David V. Kirby, First Assistant United States Attorney for the District of Vermont, Burlington, VT (John P. Tavana, Assistant United States Attorney for the District of Vermont, of counsel, Peter W. Hall, United States Attorney for the District of Vermont, on the brief), for Appellee.

Before: MESKILL, MINER and STRAUB, Circuit Judges.

MINER, Circuit Judge.

Defendant-appellant Christopher Main appeals from a judgment entered in the United States District Court for the District of Vermont (Murtha, *C.J.*), following a plea of guilty, convicting Main of mail fraud and conspiracy to distribute and to possess with intent to distribute various controlled substances, sentencing him principally to 324 months' imprisonment, and ordering restitution of $29,211.50. Once again, we are faced with the complexities involved in striking a balance between enforcing strict adherence to the provisions of Fed.R.Crim.P. 11 and disregarding variances from the rule that do not affect defendants' substantial rights.

In July 1999, during Main's plea colloquy, the District Court told Main that he faced a mandatory minimum sentence of imprisonment for his crimes. Under the Supreme Court's subsequent decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), as applied by this Court in *United States v. Thomas*, 274 F.3d 655 (2d Cir.2001) (en banc), no such minimum could have applied without proof in the record of the precise quantities of the drugs that Main

pled guilty to conspiring to distribute and possess. At Main's August 2001 sentencing hearing, the District Court failed to rectify the situation, which it could have done by clarifying in the record the specific quantities of drugs at issue. In addition, Chief Judge Murtha ordered a not insubstantial amount of restitution for the mail fraud, despite the fact that no restitution was specified in Main's plea agreement or colloquy.

While in some circumstances a district court's error in overstating an applicable minimum sentence may be harmless, that is not the case before us. Here, that error, along with the issue of the improperly-imposed restitution and other circumstances, combine to create a "critical mass" of uncertainty regarding Main's state of mind in agreeing to the plea, and, consequently, we cannot be assured on the record before us that Main's guilty plea was knowing and voluntary. Because we cannot speculate on Main's state of mind, but rather must look solely to the record in determining whether Main's plea was knowing and voluntary, we vacate the conviction and remand to the District Court with instructions that Main be allowed to withdraw his guilty plea.[1]

## BACKGROUND

Main, an individual with an extensive history of drug use and felonious conduct, and several other individuals living in Vermont were involved in a conspiracy (the "Conspiracy") to import various drugs—including cocaine, heroin, and crack—from New York City for distribution in Vermont. Main and his co-conspirators were indicted as a result of an investigation that was launched by the Government when one user of the Conspiracy's drugs turned up dead and another nearly so. During the investigation, it was also revealed that Main had hired one of his co-conspirators, Gary Harrington, to burn down a building that was owned by Main. Harrington owed Main a substantial amount of money for drugs and had agreed to commit the arson in exchange for Main's forgiveness of the debt after the insurance proceeds from the building were collected. On June 10, 1998, Main and four others were charged in a sixty-one-count indictment with various controlled-substance offenses and the forfeiture of certain pieces of real estate.

In August 1998, a Vermont federal grand jury returned a superseding indictment charging Main with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846; violation of the Travel Act, 18 U.S.C. § 1952(a)(3); eighteen separate counts of distributing controlled substances, some involving users under the age of twenty-one, in violation of 21 U.S.C. §§ 841(a)(1) and 859; and various forfeitures of real property and cash, pursuant to 21 U.S.C. § 853. Notably, the indictment did not charge specific quantities of any of the drugs Main was charged with distributing and conspiring to possess and distribute.

After Main's indictment and arrest, his attorney at the time, Cindy Ellen Hill, negotiated a plea agreement with the Government. In exchange for Main's cooperation with the Government in its case against Harrington and the other conspirators, the Government agreed to permit Main to (i) plead guilty to the counts in the superseding indictment charging him with conspiracy to possess and distribute drugs,

---

1. In light of our disposition of Main's appeal, we need not reach the other arguments raised by Main, i.e., whether the District Court should have held an evidentiary hearing on Main's motion to withdraw his guilty plea and whether the District Court properly calculated Main's base offense level under the Sentencing Guidelines.

in violation of 21 U.S.C. §§ 841(a)(1) and 846, and the forfeiture of certain property and (ii) waive indictment and plead guilty to an information charging him with mail fraud, in violation of 18 U.S.C. § 1341. The plea agreement set out the penalties for the offenses. It provided that the drug count carried a mandatory minimum penalty of twenty years' imprisonment and a maximum penalty of life imprisonment and that the maximum penalty for the mail fraud count was five years' imprisonment and a $250,000 fine. Notably, the plea agreement did not mention restitution.

On July 8, 1999, in a lengthy plea proceeding, Main accepted the plea and allocuted in open court to the elements of the crimes. The District Court described the elements of the charges to which Main was pleading, and Main confirmed his understanding of what the court told him. The prosecutor, at the District Court's direction, described the facts that the Government would prove at trial to establish the drug conspiracy and mail fraud charges. Chief Judge Murtha then asked Main if the charges were true, to which he replied, "Yes, sir."

The District Court then directed Main's attention to the Government's proffer that it would "show that throughout the course of th[e] 3–year conspiracy the quantity of drugs that were brought back were [sic] sufficient to meet the[ ] levels described in [21 U.S.C. § ] 841(b)(1)(A)"—specifically, a quantity of "5 kilos or more of a . . . mixture or substance containing cocaine . . . [or] 50 grams or more of a mixture or substance containing cocaine base." The District Court then addressed Main as follows:

> What I will be asking you shortly, Mr. Main, is the potential—if you understand the potential penalties here. And the reason we're discussing the quantities is that the [G]overnment is saying [it] would prove that the amounts involved meet the requirements of the statute as to those penalties, that I will shortly ask you about.
>
> Do you understand that?

Main replied, "Yes." It is unclear from the record, however, whether Main actually was agreeing to the quantities stated by the Government or simply acknowledging the Government's proffer. In any event, the District Court did not ask Main to provide an independent estimate of the quantities of the drugs that were the object of the conspiracy. Thus, although Main admitted to possessing, distributing, and conspiring to possess and distribute drugs, he never allocated to any specific *quantity.* Nor, as noted above, did the superseding indictment attribute any specific quantities of drugs to the Conspiracy. In addition, no mention was made of restitution during the colloquy.

Following the plea, Main's relationship with attorney Hill soured, and on November 2, 1999, Main wrote to the District Court asking that a new lawyer be assigned to his case. Hill did not object; indeed, on the same date, she filed her own motion to be relieved as Main's counsel. The District Court granted the motions and, on November 4, appointed Public Defender Elizabeth Mann to represent Main. That relationship continued until December 2000, when Mann disclosed to Main a disqualifying conflict of interest. At Mann's and Main's mutual request, the District Court relieved Mann as counsel and, on March 29, 2001, appointed federal public defender Amy Seidman to represent Main.

Notably, in Mann's motion to be relieved as Main's counsel, dated December 6, 2000, Mann mentioned that Main had expressed a desire to withdraw his guilty plea. Main made no formal motion in this regard, however, until June 15, 2001—two weeks

after Amy Seidman had taken over Main's case, and four days before Main was to be sentenced. In that motion, Main claimed that his first attorney in this case, Ms. Hill, had lied to Main about his sentencing options and, thereby, manipulated him into accepting the plea.

In a four-page, unpublished opinion and order dated July 26, 2001, the District Court denied without a hearing Main's motion to withdraw his guilty plea. Chief Judge Murtha found that Main had submitted no credible evidence in support of his allegations that attorney Hill had "lied to [Main], manipulated him, and coerced him into pleading [g]uilty."[2] The court recited several excerpts from the transcript of Main's allocution, including passages recording Main's express (i) admission to the crimes, (ii) confirmation that no threats or promises had been made inducing him to waive the superseding indictment, and (iii) acknowledgment of the finality and irrevocability of his guilty plea. The District Court concluded that these facts, along with the almost two-year delay in the filing of Main's motion to withdraw his plea, tended to show that the motion was nothing more than an opportunistic attempt by Main to renegotiate the terms of his plea.

The following day, Main filed a second motion, seeking reconsideration of the District Court's denial of Main's motion to withdraw and arguing for the first time that he should be allowed to withdraw his plea in light of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, because Main "may have [pled] guilty to a legally insufficient indictment." Main argued in support of his reconsideration motion that, because "the drug quantity under 21 U.S.C. § 841 increased his sentence[ ][and] constituted an element of the offense," the Government had been required to allege the quantities in the indictment and had failed to do so.

Main also submitted an affidavit with the motion to reconsider, swearing to the following facts: (1) Main's former attorney, Cindy Hill, had misled Main "as to the burdens of proof and the evidence required," by telling him that "if the [G]overnment could prove [he] was involved [with] even one gram of cocaine," he would be convicted and sentenced to a "twenty year mandatory minimum sentence"; (2) Hill had been unavailable to Main to plan an adequate pretrial strategy; (3) the "only reason [Main] plead [sic] guilty was because [he] was scared"; (4) Main only answered the District Court's questions the way that he did "because [he] thought [he] did not have any choice"; and (5) Hill had withdrawn from representing Main because she knew he "was so upset about the guilty plea."

On August 13, 2001, the District Court granted Main's motion for reconsideration, only to deny his underlying substantive motion for the same reasons stated in the court's July 26 order—i.e., Main's overall lack of credibility and the almost two-year delay in Main's having filed his first motion to withdraw his plea. Undeterred, on August 30, 2001, just ten days before he was scheduled to be sentenced, Main filed a second, pro se motion for reconsideration.

In the pro se motion, Main attempted to explain the delay. He stated that he had wanted to file a motion to withdraw his guilty plea since December 1999, when attorney Hill was relieved as counsel, and recounted telling both of his subsequent attorneys, as well as his mother, about his desire to withdraw the plea. Main also

**2.** Main did not submit an affidavit in support of the June 15 motion; rather, it was based on attorney Seidman's "information and belief."

stated that he would be able to obtain affidavits from Mann and his mother supporting his version and chronology of events, noting with some bitterness Seidman's failure to obtain such affidavits, but offering no explanation for this failure other than an implication that Seidman was incompetent in not having obtained them. In any event, no such affidavits were ever produced.

On August 30, 2001, at Main's sentencing hearing, Chief Judge Murtha, responding to the pro se motion, indicated from the bench that he once again had reconsidered Main's original motion to withdraw but had decided to uphold the previous denial of that motion. The District Court then sentenced Main to 324 months' imprisonment on the conspiracy count, to run concurrent to a sentence of 60 months' imprisonment for the mail fraud count, and imposed restitution in the amount of $29,211.50. Main's judgment of conviction and sentence was entered on September 5, 2001, and this timely appeal followed.

## DISCUSSION

■■■ "The decision to allow a guilty plea to be withdrawn is committed to the discretion of the district judge ... and is reviewed for an abuse of discretion." *United States v. Torres*, 129 F.3d 710, 715 (2d Cir.1997) (citation omitted). Because of the significance of ensuring that guilty pleas are made voluntarily and with knowledge of the alternatives, this Court generally requires "strict adherence" to Fed. R.Crim.P. 11, which we have held requires, inter alia, "a court to inform the defendant of, and ensure that the defendant understands, the maximum possible penalty that he faces prior to accepting his guilty plea." *United States v. Westcott*, 159 F.3d 107, 112 (2d Cir.1998) (citing Fed.R.Crim.P. 11(c)(1); *United States v. Renaud*, 999 F.2d 622, 624 (2d Cir.1993)). Following

*Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, a Rule 11 violation occurs where a defendant is provided with a "mix of information" that inaccurately sets forth "the nature of the charge to which a plea is offered, the mandatory minimum penalty provided by law ... and the maximum possible penalty provided by law." *United States v. Gutierrez Rodriguez*, 288 F.3d 472, 476 (2d Cir.2002) (internal quotation marks omitted; alteration in original); *see also id.* at 475–76 (recognizing that any Rule 11 violation that occurred prior to the *Apprendi* decision would, when the case came up on direct appeal, still be subject to *Apprendi*).

However, Rule 11 also provides, inter alia, that "[a] variance from the requirements of this rule is harmless error if it does not affect substantial rights." Fed. R.Crim.P. 11(h). Rule 11(h) "was enacted to make clear that guilty pleas should not be overturned, even on direct appeal, when there has been a minor and technical violation of Rule 11 which amounts to harmless error." *Westcott*, 159 F.3d at 112 (citing *United States v. Ferrara*, 954 F.2d 103, 106 (2d Cir.1992) (internal quotation marks omitted)); *see also United States v. Basket*, 82 F.3d 44, 48–49 (2d Cir.1996).

■■■ In *United States v. Westcott*, 159 F.3d at 112, this Court articulated the test to determine in what circumstances a variance from Rule 11 would call for a vacatur of a guilty plea and in what circumstances such a variance would constitute harmless error. The *Westcott* test focused on the effect that any misinformation given to a defendant would reasonably have had on his or her decision-making. For example, if a defendant would have been induced to plead guilty to avoid a high minimum sentence specified by a sentencing court in violation of *Apprendi*, the court's error would not be harmless. *See id.* If, how-

ever, the misinformation in all likelihood would not have affected a defendant's decision-making calculus, then the error would be harmless, and the guilty plea need not be vacated. *See id.* Notably, "whether an error was in fact harmless because it did not prejudice the defendant must be resolved on the basis of the record, not on the basis of speculative assumptions about the defendant's state of mind." *Id.* at 113 (internal quotation marks omitted). Ultimately, however, the defendant has the burden of "show[ing] that [a] district court's error had an effect on his decision to plead guilty." *United States v. Harrison,* 241 F.3d 289, 293 (2d Cir.2001).

■ In the instant case, Main was informed in the superseding indictment and again in his plea colloquy that he faced a mandatory minimum sentence of twenty years and a maximum sentence of life imprisonment on the drug counts. In fact, since no quantities had been charged, under *Apprendi,* the actual sentence range on the two counts to which Main pled guilty was zero-to-thirty years' imprisonment. Thus, Rule 11 was violated, and the only issue is whether this error was harmless—that is, whether Main has shown that the error affected his decision to plead guilty.

In arguing that the error was harmless, the Government leans heavily on the fact that Main's Sentencing Guidelines ("Guidelines") range, as it was ultimately calculated in the Presentence Report ("PSR") (about one year after the plea proceeding) was 262 to 327 months.[3] The Government notes that the mandatory minimum sen-

tence quoted to Main by the District Court was fairly close to the range calculated in the PSR for the two counts to which he pled guilty. Indeed, the Government goes so far as to contend that Main should have been "pleasantly surprised he could only be sentenced, in the worst case under his plea agreement, to thirty-five years, and not to life as he had been told."[4] The Government seems to assume that, at the time of the plea, Main was aware of or able to predict his Guidelines range. However, Main stated in his affidavit that this case was his "first federal offense and [he was] not very familiar with the federal laws and rules." The Government has failed to refute this simple fact, which tends to show that Main was not aware of his Guidelines range at the time he pled guilty.

The Government also makes much of the fact that the actual range for the two counts to which Main pled guilty does not reflect the maximum sentence that Main *could* have received if convicted of *all* counts with which he was charged in the superseding indictment. Indeed, if Main had been convicted of even three of the nineteen drug counts with which he was charged in the superseding indictment, he could easily have been sentenced to three consecutive twenty-year sentences, which, as the Government notes, would be "the realistic equivalent of a life sentence for" Main, a thirty-year-old man. However, the statutory penalties for the other counts in the indictment, to which Main did not plead, were not discussed in the plea allocution, and there is nothing in the record to suggest that those penalties were dis-

---

3. Main's original Guidelines range included a reduction for acceptance of responsibility, which the District Court, in Main's sentencing hearing, ruled was no longer applicable because of his claims of innocence as set forth in his multiple motions to withdraw his guilty plea and in his supporting affidavit.

4. The District Court could have imposed the five-year maximum sentence on the mail fraud count to run consecutively to the thirty-year maximum on the drug conspiracy count; thus, the total maximum allowable sentence on Main's plea was thirty-five years.

cussed with Main at the time he agreed to the plea.

As noted above, we will not speculate on whether Main was aware of the actual range of penalties he was facing in contrast to what he was informed by his counsel and the court, *see Westcott*, 159 F.3d at 113; rather, in determining whether the District Court's *Apprendi* violation prejudiced Main's decision-making, we look only to what is in the record. In light of this, we find unpersuasive the Government's arguments as to why Main's decision-making was not affected by the District Court's failure to comply with Rule 11. Nonetheless, it is Main, and not the Government, who bears the ultimate burden of persuasion.

At bottom, Main argues that it mattered to him a great deal in his decision to enter a guilty plea that (i) he was incorrectly informed that the crimes to which he pled guilty carried a mandatory minimum sentence of twenty years to life and (ii) he was not informed either in his plea allocution or in the plea agreement that he would be responsible for paying restitution in the amount of $29,211.50. Main claims that, had he known that he was *not* potentially facing a life sentence at trial and that he *was* certainly facing the restitution payment if he pled guilty, he would have had much less of an incentive to plead guilty, and, because he was not informed of these facts, "he was not in a position to make a knowing and rational choice about pleading guilty and foregoing his right to trial."

The District Court was not persuaded by Main's arguments, in large part because of his two-year delay in presenting them to the court. Although Main delayed for almost two years before making a formal motion to withdraw the plea, circumstances set forth in the record somewhat mitigate his delay—for example, the fact that Main's second attorney, Elizabeth

Mann, had to withdraw over a conflict. Indeed, a plain reading of Mann's motion to withdraw as Main's counsel indicates that, as early as October 2000, Main and Mann "ha[d] had numerous telephone discussions and written communications ... regarding [the plea withdrawal] and related issues."

In any event, the critical factor here is not the delay, but rather the gap between the practical effect of a district court informing a defendant of the wrong *minimum* penalty and the effect of the court informing him of the wrong *maximum* penalty. We have found the former scenario far more troubling. *See Harrison*, 241 F.3d at 293. In *Harrison*, as here, the district court, among other errors, misinformed the defendant about the minimum sentence he would have faced if convicted of the crimes to which he eventually pled guilty. *See id.* at 294–95. We held that a combination of errors that casts doubt on whether a plea was knowing and voluntary can create a sufficiently "troubling record of confusion" to warrant vacatur of the conviction even where the individual errors may have been harmless. *See id.*

Here, as in *Harrison*, the District Court informed the defendant that a mandatory minimum sentence applied when one did not. Regarding the sentence itself, the difference between the sentencing range that the court initially described to Main (mandatory twenty-years-to-life) and the actual range allowed under *Apprendi* (zero-to-thirty years) was substantial. Moreover, as we recognized in *Harrison*, "it ... is a fact of life under the Sentencing Guidelines that Section 5K1.1 motions are virtually the only mechanism for defendants to bypass statutory mandatory minimum sentences, and they provide a strong incentive for guilty pleas." *Harrison*, 241 F.3d at 294. Because a mandatory minimum sentence represents such a strong inducement

# 186

to plea, where a defendant has been informed, as Main was, that he is facing such a sentence, that information is presumptively significant in the defendant's decision-making.

 Further, as there was in *Harrison*, here, there is "the impression of sufficient confusion," *id.* at 294, in the record. For example, it is far from clear whether Main was admitting to the drug quantities stated by the Government in the plea colloquy, or simply acknowledging that the Government (a) had accused him of dealing in that quantity and (b) was affirming that it would offer proof to that effect at trial. We cannot say that the District Court's failure to comply with Rule 11 was rendered harmless by Main's admission to the drug quantities where it is far from clear that he made any such admission. It would be a different case entirely had Main, "as part of the proceeding, admit[ted] to the truth of the pertinent facts, and [if] the record as a whole cast[] no doubt on the accuracy of that admission." *Gutierrez Rodriguez*, 288 F.3d at 477. But such is not the case here.

 Finally, in this Circuit, a "district court's failure to advise a defendant of the possibility that his sentence could include an order of restitution, followed by a sentence that included such an order, [is] not harmless error." *United States v. Showerman*, 68 F.3d 1524, 1528 (2d Cir.1995) (citing *United States v. Khan*, 857 F.2d 85, 86–88 (2d Cir.1988)). During Main's plea colloquy, no mention was made of the $29,211.50 restitution that the District Court ultimately ordered Main to pay pursuant to 18 U.S.C. § 3663A(a)(1). Thus, at least with regard to that particular, the court plainly committed non-harmless error.

While Main's effort to withdraw his plea may to some extent have been a product of 20–20 hindsight, we are nevertheless persuaded that the record in this case reveals significant errors and a substantial degree of uncertainty as to Main's state of mind. Indeed, the errors here, in combination, cast doubt on whether Main's guilty plea was knowing and voluntary. Thus, based on the record and disregarding any speculation into Main's possible motives for wanting to withdraw the plea, "[t]he combination of circumstances tips the scales" in Main's favor and warrants reversal of the District Court's judgment of conviction. *See Harrison*, 241 F.3d at 295. Accordingly, we conclude that the District Court abused its discretion in denying Main's motions to withdraw his guilty plea.

## CONCLUSION

In light of the foregoing, we vacate the judgment of conviction and sentence, and remand the case to the District Court with instructions that Main be allowed to withdraw his guilty plea.[5]

---

5. Of course, this means that the Government, too, is no longer bound by the terms of the plea agreement and is free to withdraw it and reinstate all counts in the superseding indictment against Main. And, in the event of conviction after trial, Main would be subject to the full range of penalties authorized by law, including restitution. We would normally delay the issuance of our mandate to afford Main a reasonable amount of time in which to withdraw his appeal, if he so chose, so as to avoid the risk of exposure to an increased sentence, which would amount to a pyrrhic victory on appeal. *Cf., e.g., Showerman*, 68 F.3d at 1529. At oral argument we requested Main's counsel to advise us as to whether

---

Main wished to pursue the appeal notwithstanding these risks. In response, Main's counsel submitted a letter conveying Main's unequivocal "wish[ ] to have his guilty plea

vacated" regardless of the risks. Accordingly, our mandate shall issue forthwith: "Fiat justitia, ruat coelum."