Ralph OYAGUE, Petitioner–Appellant,

v.

Christopher ARTUZ, Superintendent, Green Haven Correctional Facility, Defendant–Appellee.

Docket No. 03–2508.

United States Court of Appeals, Second Circuit.

Submitted: June 16, 2004.

Decided: Dec. 15, 2004.

Joyce C. London, New York, NY, for Petitioner–Appellant.

Thomas J. Spota, District Attorney for Suffolk County (Glenn Green, Asst. District Attorney, on the brief), Riverhead, NY, for Defendant–Appellee.

Before: WALKER, Chief Judge, B.D. PARKER, Circuit Judge, and MORDUE, District Judge *.

MORDUE, District Judge.

Petitioner-appellant Ralph Oyague ("Oyague") appeals from a judgment entered July 28, 2003, in the United States District Court for the Eastern District of New York (Jack B. Weinstein, *District Judge*). The district court denied the petition for a writ of habeas corpus but granted Oyague a limited certificate of appealability with respect to two closely related claims: alleged ineffective assistance of his trial counsel and alleged involuntariness of his guilty plea. We affirm.

## Background

Oyague was charged in Suffolk County, New York in an eight-count indictment premised on a January 20, 1995, robbery of National Westminster Bank in Huntington Station, Long Island. The indictment charged the following under New York Criminal Law: one count of attempted murder of a police officer in the first degree, four counts of robbery in the first degree, two counts of robbery in the second degree and one count of criminal possession of a weapon in the second degree. An Offense Report prepared by the Suffolk County police department charged

* The Honorable Norman A. Mordue, of the United States District Court for the Northern District of New York, sitting by designation.

that Oyague and a companion entered the bank on the date in question armed with hand guns. The police asserted that while his accomplice remained in the public area of the bank, telling employees and customers to look at the floor, Oyague jumped behind the counter into the teller area, took money out of two different tellers' drawers and then threatened the assistant bank manager at gunpoint saying he would "blow her head off" unless she opened the locked drawers of two tellers who were at lunch. Before these additional drawers could be unlocked, the two men fled from the bank with the proceeds of the robbery. The police reported that as the bank robbers fled, two shots were fired, one of which struck a responding officer in the leg. Oyague was found hiding near the scene with a canvas bag and a .38 caliber handgun with the serial numbers filed off.

Oyague later gave a statement to police admitting to his involvement in the robbery:

Eddie and I ran out of the bank towards where the car was parked. Just before we got to the car, a police car showed up. When I saw the cop get out of the car I turned towards him with the gun in my hand. I kind of blacked out, everything was happening so fast, at that time the gun could have gone off, I don't remember hearing the shot. I started to run and threw the canvas bag and the gun as I was running. The next thing I knew a cop tracked me to the ground and handcuffed me.

### The *Huntley/Wade* Hearing

On November 13, 1995, the trial court commenced an evidentiary hearing prior to which the district attorney's office turned over extensive *Rosario* material. The court ordered a recess so that the material could be reviewed by Oyague's counsel, and the status of any plea offer could be discussed. When the court reconvened, Oyague's counsel stated that his client would not accept the plea offer discussed during the lunch break. The state then called its first witness, Detective John Clark. Clark testified that during his questioning of Oyague, he accused the suspect of shooting a police officer. Clark testified that Oyague answered, "I didn't know anyone got shot, and I never heard a shot ... I just remember running from the bank and I remember getting arrested. I don't remember anything else. Maybe I blacked out."

Oyague alleges that during another short recess, the trial judge commented to him off-the-record that he should plead guilty because "the prosecution had a lot of evidence against [him]" and that if Oyague were convicted, he would spend the rest of his life in prison. Oyague's counsel averred that in advising his client regarding the consequences of accepting or rejecting the plea offer, he told Oyague that if he were found guilty by a jury after trial he could be sentenced consecutively on the robbery counts to serve a maximum of 65 years to life imprisonment.

After the court's recess, Oyague's counsel informed the trial court that a plea agreement had been reached. Counsel advised that Oyague had agreed to plead guilty on two counts of first degree robbery and on one count of first degree assault, a lesser included offense of the charge of attempted murder, with the understanding that if he complied with the terms of his release and appeared for sentence on January 16, 1996, one of the robbery counts would be dismissed, and he would be sentenced to a term of 17½ to 35 years' imprisonment. If, alternatively, Oyague violated the law or failed to appear for sentencing, he agreed to be sentenced *in absentia* to consecutive sentences of 12½

to 25 years on each robbery count, and 7½ to 15 years on the assault count.

### The Plea Proceedings

When the trial judge asked Oyague whether he had had sufficient time in which to consult with his attorney about the plea, Oyague answered, "No." The judge then told Oyague to sit down because he was "not playing games anymore." After a series of further questions by the court, Oyague acknowledged that he had had sufficient time to discuss the proposed plea with his counsel. Oyague also told the court that he was taking antidepressants and had taken Zoloft within the last twenty-four hours. In response to the Court's questioning regarding his medication use, Oyague said he was not aware that taking Zoloft impaired his judgment. When the prosecutor began examination of Oyague in connection with his plea allocution, Oyague responded to the questions saying, "I am not well ... I just had a dizzy spell." The plea continued after a short break during which Oyague stated "Sir, I want to finish." Oyague then answered "Yes," when the prosecutor asked whether he, along with his nephew, had entered the bank with a handgun and "stole money from two separate teller stations, two separate tellers." The following colloquy addressed the assault count:

> MR.CLAYTON [PROSECUTOR]: And while you were running, you spun and you shot at one of the police officers, striking him in the leg; is that correct?
>
> THE DEFENDANT: I don't remember that, sir.
>
> THE COURT: Did you shoot—did you turn around and shoot the gun?
>
> THE DEFENDANT: I was told I did. I was in shock.
>
> . . . . .
>
> THE COURT: Did you turn around and fire that gun?

> THE DEFENDANT: I was told I did, your Honor. It is possible.
>
> THE COURT: Did you hold the thirty-eight gun?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Was the police officer struck with—can the People prove the police officer was struck by the thirty-eight?
>
> MR. CLAYTON: That's correct.
>
> THE COURT: You did turn and shoot that gun; is that correct, Mr. Oyague?
>
> THE DEFENDANT: I believe so, your Honor.
>
> THE COURT: That's fine.

Whereupon the trial court accepted Oyague's plea.

## Procedural History

### Post–Plea Proceedings

On January 5, 1996, prior to his scheduled sentencing date, Oyague, with the assistance of new counsel, filed a motion to withdraw his plea. He made the following arguments: (1) there was no factual basis for the assault plea when he neither recalled the shooting nor admitted an intent to harm; and (2) the plea was not knowing or voluntary because of insufficient time to consult with his lawyer, faulty sentencing information given by the judge and counsel, his disoriented and unwell state during the hearing, and the judge's coercive off-the-record statements recommending that he plead guilty due to the strength of the prosecution's case.

In its January 30, 1996 decision, the trial court denied Oyague an evidentiary hearing and denied his motion to withdraw the plea, on the grounds that it was knowing and voluntary. The court made the following findings: (1) Oyague's stated "belief" that he shot the police officer was sufficient for allocution; (2) Oyague was not

required to allocute to all elements of Count 7 of the indictment because he pleaded guilty to assault, a lesser included offense of attempted murder; (3) Oyague had been lucid, rational and able to fully comprehend his plea at the time he entered it; (4) Oyague's "dizzy spell" and the fact he was taking antidepressants did not warrant vacatur of his plea since Oyague acknowledged that he understood the plea proceeding and his faculties were not impaired by the medication; (5) Oyague did acknowledge during the plea proceeding that he had been afforded sufficient time to consult with his attorney and that he believed pleading guilty was in his best interest; and (6) there was no evidence that he had been misinformed of his sentence exposure because he could have received 50 years to life if he was convicted on all counts in the indictment. The trial court further found that even if the lawyer's representation was wrong, it was harmless error because Oyague, who was forty-three at the time of the plea, would most likely have spent the rest of his life in prison had he been sentenced to a maximum term after conviction under either scenario—50 or 65 years.

### Denial of *Habeas* Relief

Oyague was first sentenced on January 30, 1996, as a predicate felon, resulting in a term of 7½ to 15 years on the assault count, and ten to twenty years for one count of robbery. After it was determined that he was not a predicate felon, he was resentenced on the assault count to five to fifteen years on February 5, 1996. As part of his plea agreement Oyague waived his right to appeal, although he later filed a number of appeals and motions in the state courts. Oyague ultimately filed a federal *habeas* petition alleging, *inter alia,* that his plea was not voluntary due to his being under the influence of drugs and in poor health at the time of the plea, that his

allocution was insufficient, and that his counsel was ineffective on a number of grounds.

The district court readily dispatched these claims but paused before dismissing Oyague's principal claim that he was coerced into pleading guilty because of erroneous information given to him by his counsel and the trial court. The district court noted:

The 32–year difference in the potential minimum sentence is huge. But is it sufficient under the circumstances for this court to conclude that but for the erroneous information provided by counsel (and perhaps the trial court), petitioner would not have pled guilty? The answer to that question is not obvious under the circumstance of the present case. Supporting petitioner's view is the fact that, upon being provided with new counsel by his family, petitioner moved to withdraw his plea just six weeks after he entered it, and two weeks before he was scheduled to be sentenced.

Respondent counters by suggesting that petitioner, who was 43 years old at the time of sentence, would have accepted the plea offer of 15 to 35 years—the term for which he was actually sentenced—irrespective of whether he was properly advised that he might face a minimum prison term of 33–1/3 years to life in prison rather than 65 years to life in prison, because a 33–1/3 year sentence would in essence be a "life sentence." Some persons might take exception to the state's implication that a 76–year-old (petitioner's age if he were released after 33–1/3 years) is as good as dead.

The point is made more difficult because petitioner stated clearly, just a *short time* after pleading guilty and arguably learning that he had been misinformed, that he wished to withdraw his plea.

There appears to have been no gamesmanship in petitioner's attempt to withdraw his plea. Prejudice under these circumstances is not clear. He will apparently now get out of prison at age 58 instead of, *potentially,* at age 76. Although that is a large difference that would have convinced many to accept the plea, it is a difference that was significantly less than what was arguably presented to him—i.e., potential release at age 58 instead of, at earliest if convicted of all charges, age 108.

This court considered seriously granting the writ. While the case is close, on balance the decision to deny seemed more consonant with current law. This is not a case of innocence. The Court takes judicial notice (though it does not rest on this ground) that the co-perpetrator, petitioner's nephew, went to trial and was convicted.

Though it denied Oyague's *habeas* petition, the court below granted a certificate of appealability concerning the issue of the alleged ineffectiveness of Oyague's counsel in advising him about the potential sentence he faced upon conviction and the related issue of the voluntariness of his plea. Oyague's appeal from this judgment is now before this Court.

## Discussion

■ We review *de novo* the decision by the district court to deny *habeas* relief to Oyague. *Hines v. Miller,* 318 F.3d 157, 160 (2d Cir.2003). While *de novo* review is required, this Court is still "dependent on the district court to identify and sort out the issues on such motions, to examine and analyze them, and to apply the law to the facts accepted by the court for purposes of the motion." *Beckford v. Portuondo,* 234 F.3d 128, 130 (2d Cir.2000). Thus, we are "entitled to the benefit of the district court's judgment, which is always helpful and usually persuasive." *Id.*

■ We begin by acknowledging, as did the district court, that under 28 U.S.C. § 2254(d), a federal *habeas* court "is required to give deference to findings of fact made by the state court after a full and fair hearing at which the material facts were adequately developed, unless the federal court concludes that the record as a whole does not fairly support the state court's factual determination." *Matusiak v. Kelly,* 786 F.2d 536, 543 (2d Cir.1986). On the other hand, ultimately legal questions, such as whether a defendant has effectively waived his federal constitutional rights in a proceeding, are governed by federal standards. *See Boykin v. Alabama,* 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Indeed, "the governing standard as to whether a plea of guilty is voluntary for purposes of the Federal Constitution is a question of federal law . . . and not a question of fact subject to the requirements of 28 U.S.C. § 2254(d)." *Marshall v. Lonberger,* 459 U.S. 422, 431, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) (citations omitted). However, the question of whether a plea of guilty has been entered voluntarily within the meaning of the Constitution is often a complex one that involves mixed questions of law and fact. These inquiries are notably not governed by the requirements of § 2254(d). Instead, the components of voluntariness "constitute, or at least . . . depend on, questions of fact the state court determinations of which are subject to the requirements of § 2254(d)." *See Matusiak,* 786 F.2d at 543.

Oyague's *habeas* claims herein are premised on twin tenets—involuntariness of his plea and inadequate performance by his trial attorney. At the crossroads of these closely related claims is Oyague's primary argument—to wit, Oyague asserts

that both his trial counsel and the trial court overstated by more than 30 years his minimum possible sentence if he went to trial and were convicted. Oyague insists he would not have pled guilty had he known of this misrepresentation. We address this issue first since it gave the district court the most pause.

■ The district court concluded that if Oyague had gone to trial and been convicted on all counts for which he could legally have stood trial, his minimum potential jail sentence was actually 33⅓ years to life, "rather than the minimum 65 years to life in prison that he was advised by counsel (and perhaps the trial court) that he faced." The district court deemed this perceived 32–year difference in the potential minimum sentence "huge" and was nearly prompted to award Oyague *habeas* relief on this ground. There was, however, no actual misrepresentation by Oyague's counsel or the trial court of his minimum potential sentence upon conviction. Contrary to the district court's interpretation of his attorney's advice, Oyague was not told that he faced a *minimum* term of 65 years in prison if convicted. Rather, the record demonstrates that Oyague's counsel informed his client that if he went to trial and were convicted, he could face a "*maximum* [sentence] of 65 years to life." Indeed, Oyague stated in an affidavit that his attorney told him he "could be," not that he *would* be, sentenced to consecutive terms totaling 65 years to life imprisonment. This was technically an overstatement to the extent that while the actual maximum Oyague faced was the same— life in prison—Oyague would be eligible for parole after serving 50 rather than 65 years. Thus, the error by Oyague's counsel was merely in overstating the potential *minimum period* of the maximum indeterminate sentence Oyague faced.

The distinction is crucial, particularly because we view misrepresentations of maximum sentences far less critically than overstatements of minimum sentences. *See United States v. Harrington,* 354 F.3d 178, 185 (2d Cir.2004). Since the discrepancy in the sentence Oyague faced was less in both years and significance than interpreted by the district court, denial of *habeas* relief was appropriate.

■ Oyague argues that his counsel misled him into believing he could be sentenced consecutively on the robbery counts. He argues that under New York law, he could not have been sentenced consecutively on the robbery counts because the robberies arose out of the same act. *See* N.Y. Pen. Law § 70.25. Oyague relies primarily on *People v. Ramirez,* 89 N.Y.2d 444, 453, 654 N.Y.S.2d 998, 677 N.E.2d 722 (1996), in which the defendant robbed a bank vehicle manned by two security officers. The Court of Appeals held that Ramirez could not be sentenced consecutively for the robberies of one of the security guards and the bank because those robberies depended on the exact same physical act. *Id.* at 452–53, 654 N.Y.S.2d 998, 677 N.E.2d 722. What Oyague fails to note, however, is that the *Ramirez* court simultaneously upheld consecutive sentences for the robbery counts related to the other security guard. *Id.* at 454, 654 N.Y.S.2d 998, 677 N.E.2d 722. While that robbery was part of the same transaction, it was nevertheless sufficiently distinct to support a consecutive sentence. *Id.* Numerous Appellate Division decisions have likewise upheld consecutive sentences for robberies of separate victims "within a single extended transaction." *People v. White,* 192 A.D.2d 736, 737, 597 N.Y.S.2d 117 (2nd Dep't 1993); *see also People v. Niles,* 258 A.D.2d 478, 479, 685 N.Y.S.2d 104 (2nd Dep't 1999) (same); *People v. Brathwaite,* 63 N.Y.2d 839, 843, 482

N.Y.S.2d 253, 472 N.E.2d 29 (1984) (affirming imposition of consecutive sentences for two convictions of felony murder that occurred "in the course of a single extended [robbery] transaction"). Although the facts in this case were never fully developed, Oyague did allocute to forcibly stealing money from two separate tellers. Consequently, it was probable, and even likely that had Oyague been convicted, he would have been lawfully sentenced to consecutive terms on the robbery counts.

■ We next address Oyague's claim that his plea was not voluntary. When a guilty plea is entered, the defendant waives several federal constitutional rights, including the right to trial by jury, the right to confront his accusers, and the privilege against compulsory self-incrimination. *See Boykin*, 395 U.S. at 243, 89 S.Ct. 1709. For the plea to be voluntary, "[i]t is axiomatic" that the defendant must at least be competent to proceed. *United States v. Masthers*, 539 F.2d 721, 725 (D.C.Cir.1976). In addition, he must have an awareness of the true nature of the charge against him, *see e.g., Henderson v. Morgan*, 426 U.S. 637, 645, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976); have a "rational as well as factual understanding of the proceedings against him," *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam) (internal quotation marks omitted); and have knowledge of the nature of the constitutional protections he will forego by entering his plea, *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Indeed:

> The standard set by *Boykin v. Alabama* with respect to the voluntariness of a plea of guilty for federal constitutional purposes requires not only that the plea court inquire into the defendant's understanding of the charges, the proceedings, and the rights to be foregone, but

> also that it do so showing 'the utmost solicitude of which [the court is] capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence.'

*Matusiak*, 786 F.2d at 544 (quoting *Boykin*, 395 U.S. at 243–44, 89 S.Ct. 1709) (brackets in original).

After thorough review of the record, this Court rejects Oyague's contention that his plea was not voluntary, knowing, and intelligent because: 1) he had neither adequate time to consult with counsel; 2) nor the mental clarity to enter a plea due his use of the drug Zoloft. As the district court noted correctly, Oyague's claims regarding his inability to comprehend the plea proceeding and his unpreparedness to enter a plea are belied by the record and are contrary to Oyague's express representations during the plea.

■ Oyague argues in the alternative that his plea allocution was legally deficient to establish the element of intent in connection with the charge of first degree assault. Although he at first denied any recollection of shooting a police officer while fleeing from the bank, Oyague later admitted that he held the .38 caliber handgun from which, the state asserted, a shot had been fired that struck the police officer in the aftermath of the bank robbery. Oyague also stated that he "believe[d]" he "turn[ed]" and shot the gun. Thus, Oyague admitted the acts alleged in the indictment and his intent to commit the lesser included offense of assault is "readily inferrable." *People v. McGowen*, 42 N.Y.2d 905, 906, 397 N.Y.S.2d 993, 366 N.E.2d 1347 (1977) (internal quotation marks omitted) (defendant who negotiated plea to assault in first degree from charge of attempted murder argued plea should be vacated because elements of crime were "not clearly spelled out" in statements he

made to court at time of plea but record showed defendant admitted committing acts alleged and his intent was "readily inferrable" from statements regarding circumstances of crime).

 Arriving at Oyague's final argument regarding the alleged inadequate performance of his trial counsel, we note that a petitioner advancing an ineffective assistance of counsel claim faces a considerable burden. To prevail, a petitioner must demonstrate that his counsel's representation "fell below an objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. We have long said that a defendant is not entitled to representation by a "modern-day Clarence Darrow"—mere competence will suffice. *United States v. Alessi,* 638 F.2d 466, 477 (2d Cir.1980).

The district court found it unnecessary to address each of Oyague's claims of ineffectiveness of his trial counsel individually since *habeas* relief was unwarranted even assuming the truth of petitioner's claims singly or cumulatively. We likewise find none of the alleged deficiencies sufficient to establish that petitioner was denied effective trial counsel under the standards of *Strickland.* It is simply improbable that Oyague would not have pled guilty but for his counsel's alleged unprofessional performance. The record, by way of the evidentiary hearing which preceded the plea allocution and Oyague's statements during the plea, reveals strong evidence of Oyague's guilt. When this evidence is viewed together with the nature of the charges against him and the considerable penalties involved, there is no reasonable probability that Oyague would not have accepted the State's plea offer. Accordingly, the district court was correct in denying petitioner's claim for *habeas* relief.

## Conclusion

The judgment of the district court is affirmed.